18 So.2d 650

**LEBLEU et al. v. HANSZEN et al.**
No. 37100.

May 22, 1944.

Plauche & Plauche, of Lake Charles, for appellants.

Liskow & Lewis, of Lake Charles, for appellees.

ROGERS, Justice.

Plaintiffs seek to be declared the owners of an undivided interest in Lot 6 of Section 2, Township 9 South, Range 8 West in the Parish of Calcasieu.

Plaintiffs claim title to the property under a chain emanating from the United States Government. Defendants claim title to the property under a chain originating with the Swamp Land Grant Acts and a patent from the State of Louisiana.

After alleging that they hold the superior title, defendants, in the alternative, claim ownership of the property by the prescription of ten years acquirendi causa.

The judge of the district court held that plaintiffs' record title was superior to defendants' record title but not to defendants' prescriptive title. He therefore maintained defendants' plea of prescription of ten years acquirendi causa and rejected plaintiffs' demands. Plaintiffs have appealed from the judgment.

The tract of land in dispute contains approximately eighty-seven acres. Plaintiffs allege that the land originally formed part of Rio Hondo Claim No. 251. Plaintiffs are the same parties, with some additional co-heirs, who successfully asserted title to an interest in about 500 acres of swamp or timber land in Rio Hondo Claim No. 251 in the case of Little v. Barbe, 195 La. 1071, 198 So. 368. Plaintiffs contend that the land in dispute in this case is embraced in the Rio Hondo Claim No. 251 which was involved in that case. Defendants vigorously deny plaintiffs' contention. Defendants assert that the land involved here is on the opposite side of the Calcasieu River to the land involved in Little v. Barbe and that it never formed any part of the Rio Hondo Claim No. 251. Defendants say that the land is different and that it was possessed by other parties under a different title. Defendants say that, although the plaintiffs in both suits are the same, the defendants and the issues are not the same.

Plaintiffs' alleged title to the property in dispute is based upon what is referred to in the record as Rio Hondo Claim No. 251. The claim was filed on February 21, 1824, with the Register and Receiver of the United States Land Office at Opelousas by Arsene LeBleu for Martha Andrus. The claim embraced about 640 acres and, when filed, was accompanied by a written assignment of the claim by Martha Andrus to Arsene LeBleu. On November 1, 1824, the Register and Receiver of the United States Land Office reported the claim for confirmation (American State Papers, Vol. IV, p. 71) and it was confirmed by Act of Congress of May 24, 1828, 6 Stat. 382.

The report of the Register and Receiver shows that John Clark was the first person who settled upon and began clearing the land to which the claim designated as Rio Hondo Claim No. 251 was made. About the year 1814, Clark sold his claim to Sally Andrus, the daughter of Martha Andrus, and from whom Martha Andrus inherited the claim. The report shows also that about three years later Arsene LeBleu entered upon and cultivated the land for Martha Andrus. A final certificate of location was issued for the Rio Hondo

Claim No 251 in the name of Martha Andrus on December 28, 1852, in virtue of settlement and cultivation. However, a patent was not issued to Martha Andrus and to her heirs and assigns until March 13, 1907. But this patent was not necessary as evidence of title of the heirs or assigns of Martha Andrus because the Act of Congress of May 24, 1828, confirming the claim of Martha Andrus, and the final certificate of location, dated December 28, 1852, constituted a complete transfer of title from the Government to Martha Andrus and to her heirs or assigns. Little v. Barbe, 195 La. 1071, 198 So. 368.

Arsene LeBlue died October 17, 1850, and his succession was opened in February 1852. At a sale of the succession property, the 640-acre tract was adjudicated to Eliza Milhomme, the widow of Arsene LeBleu. Plaintiffs claim as the heirs or as the transferees from some of the heirs of Mrs. Eliza Milhomme LeBleu.

Defendants contend that the particular tract of land in dispute never formed any part of the lands included in the Rio Hondo Claim No. 251 entered by Arsene LeBleu as assignee of Martha Andrus. They say that claim described only land on the "West side" of the Calcasieu River and in the "neutral territory", while the land involved in this suit is situated on the opposite side of the Calcasieu River.

Defendants' alleged title to the property in dispute is based upon the acquisition of the land by the State of Louisiana under the Swamp Land Grant Act of March 2, 1849, 9 Stat. 352, and Selection List No. 1, approved by the Secretary of Interior of the United States, on May 5, 1852. On January 15, 1868, Albert Johnson acquired the tract of land by purchase from the State of Louisiana under Warrant No. 195 N.S.D., in accordance with Graduation Act of March 3, 1857, 11 Stat. 186. On April 15, 1941, a patent based on Certificate No. 195 N.S.D. was issued by the State to Albert Johnson, his heirs and assigns. William G. Kibbe acquired the land by purchase from Johnson by warranty deed executed on February 27, 1868. On January 16, 1901, by warranty deed, Kibbe conveyed the land to J. Albert Bel, who died in December, 1918. Mrs. Della Goos Bel, the widow of J. A. Bel, died in May, 1934.

Defendants claim title to the land in dispute as the heirs of J. A. Bel and his wife, Della Goos Bel.

The claim as originally filed by Arsene LeBleu for Martha Andrus refers to 640 acres of land in the neutral territory on the west side of the Calcasieu River, and the Acts of Congress of 1823 and 1824, 3 Stat. 756 and 4 Stat. 65, under which the claim was made refers to lands situated "between the Rio Hondo and Sabine River." These lands prior to the treaty entered into between the United States and Spain on February 22, 1819, 8 Stat. 252, were known as the "neutral territory," which was recognized by this Court in Smith v. Albritton, 153 La. 507, 96 So. 49, 50, as situated "east of the Sabine river and west of the Arroyo Hondo, the Kisachey, and the Calcasieu." The report of the Register and Receiver of the United States Land Office, on November 1, 1824,

refers only to a tract of land "in the late neutral territory, situated on the west side of the river Quelquesheu" (Calcasieu).

The tract of land involved in this suit is on the left descending bank, or east side, of the Calcasieu River whereas the main body of land claimed under Rio Hondo Claim No. 251, as to which plaintiffs' title was upheld in the case of Little v. Barbe, is on the right descending bank, or west side, of the Calcasieu River.

In 1836 Thomas Bilbo, United States Deputy Surveyor, surveyed for Arsene LeBleu, assignee of Martha Andrus, what he considered to be the land comprised in the Rio Hondo Claim No. 251. There is no order from the General Land Office on file in the local land office or elsewhere, directing Bilbo to make the survey, but the plat showing the survey and attached procès verbal, which were made on July 11, 1836, are on file in the United States Land Office.

According to the survey made by Bilbo, Rio Hondo Claim No. 251 comprised 640 acres, of which 450.75 acres were situated on the west side of the Calcasieu River in Section 2, Township 9 South, Range 8 West. The remaining acreage was situated on the opposite side of the Calcasieu River. It embraced 87 acres (the land in dispute) in Section 2, Township 9 South, Range 8 West and 102.25 acres adjoining the 87 acres on the south in Section 11, Township 9 South, Range 8 West. On December 28, 1852, approximately sixteen years after the survey and attached procès verbal made by Bilbo was filed in the United States Land Office, a certificate of location was issued by the Register of the Land Office in favor of Martha Andrus, covering 632.78 (not 640) acres of land in Section 2, Township 9 South, Range 8 West and Section 35, Township 8 South, Range 8 West. No reference whatever is made in this certificate to the survey and plat which was previously made by Bilbo. The certificate, however, mentions Lot 6 (no measurement or acreage given) of Section 2, Township 9 South, Range 8 West, which comprises the tract of land claimed by plaintiffs in this suit. In 1824 when the original claim was made the land embraced within the claim could not be described by legal subdivisions because at that time the land had not been surveyed. The official survey of the township was not made until the latter part of September, 1830, as shown by the field notes and plat of Edward R. Downing, Deputy Surveyor, on file in the United States Land Office.

On March 13, 1907, a patent was issued by the United States Government to Martha Andrus and to her heirs and assigns covering lands in Section 2, Township 9 and Section 35, Township 8, containing in the aggregate 598.07 acres of land.

The Bilbo survey and plat, the Register's certificate of location and the United States Patent are relied on by plaintiffs as controlling on the issue of title and as fully establishing their title to the tract of land in dispute.

As pointed out in the opinion of this Court in Little v. Barbe, the patent from the United States Government, dated March 13, 1907, was probably issued at the instance of a granddaughter of Arsene

LeBleu and Eliza Milhomme LeBleu, from whom the defendants in the suit of Little v. Barbe were claiming title by inheritance. And, as further pointed out in the opinion in Little v. Barbe, the patent was not at all necessary as evidence of the title of the heirs or assigns of Martha Andrus, because the Act of Congress confirming her claim and the final certificate of location, dated December 28, 1852, constituted a complete transfer of title from the government.

The tract of land in dispute was not described in any muniment of plaintiffs' alleged title until the certificate of location was issued by the Register of the United States Land Office on December 28, 1852, at which time defendants claim that the land had passed from the United States to the State of Louisiana under the Swamp Land Grant Act of 1849. The land in dispute was selected on December 7, 1851 and approved to the State on May 5, 1852, seven months prior to December 28, 1852, the date of the certificate of location issued by the Register of the United States Land Office.

Plaintiffs insist that the land in dispute did not pass to the State by virtue of the Swamp Land Grant Act as claimed by defendants, because, under section 2 of the Act, the Secretary of the Treasury was authorized to approve to the State the swamp lands selected by the State only "so far as they are not claimed or held by individuals."

In his reasons for judgment, the trial judge stated that under this section of the Act of Congress if a claim had been made by an individual to any of the land referred to in the act prior to its adoption as to such claims the provisions of the act would not apply. However, he did not affirmatively hold, as we understand from his reasons for judgment, that the tract of land in dispute here was so held prior to its acquisition by the State from the government. The trial judge, after stating in his reasons for judgment that there were "strong basic grounds" for the contentions made by counsel for defendants and that their contentions appealed to him with considerable force, expressed the opinion that plaintiffs had the paramount record title. He based his opinion on the following facts:—that there was not sufficient acreage in that part of the Rio Hondo Claim lying on the west side of the Calcasieu River to make up the 640 acres as recited and called for in the original entry, and that the tract of land in dispute was included in the certificate and attached procès verbal made by Bilbo, the recommendations of the Register and Receiver of the United States Land Office of claims to be confirmed, the Act of Congress confirming the recommendations, and the final certificate of title issued in favor of Martha Andrus.

We are not prepared to accept as correct the conclusion reached by the trial judge that plaintiffs have the paramount record title. While it is true, as contended by plaintiffs, that the Register and Receiver was authorized to locate lands claimed under the Acts of Congress of 1823 and 1824 and confirmed by the Act of Congress of 1828, nevertheless he was not authorized

and could not be authorized to locate any land except land which belonged to the government. No act of Congress could grant the right to the Register and Receiver to locate the claim on land belonging to the State. And as has been pointed out, at the time the certificate of location was issued, the title to this property had passed to the State by the Swamp Land Grant Act of 1849. While it is true also that Arsene LeBleu and his successors under Rio Hondo Claim No. 251 were entitled to 640 acres of land, they were not entitled to defendants' land or to land that belonged to the State at the time the location was made. Moreover, the claim itself, the approval thereof, and the 1828 Act of Confirmation referred to 640 acres of land on the west side of Calcasieu River and not to lands on both sides of the river. It is extremely doubtful that Arsene LeBleu claimed, much less owned, the land in dispute which was situated across the river from LeBleu's claim under settlement and cultivation when the Swamp Land Grant Act was adopted and on May 5, 1852, the date when the land was approved to the State of Louisiana. LeBleu signed the document that was filed with the Register of the Land Office in 1824 and under its express terms limited the land claimed to the west or opposite side of Calcasieu River.

Although he was of the opinion that the plaintiffs had the better record title, the judge of the district court maintained defendants' plea of ten years prescription acquirendi causa and accordingly rendered judgment recognizing the defendants as the owners of the property in dispute.

As our views are in accord with those of the judge of the district court on defendants' plea of prescription, we do not find it necessary to pass affirmatively upon the question of whether plaintiffs or defendants have the paramount record title.

Considering the merits of the plea of prescription, we find that defendants show an unbroken record title to the land in dispute emanating from the State of Louisiana, based upon the purchase by Albert Johnson from the State on January 15, 1868. Johnson sold the land to William G. Kibbe by warranty deed on February 27, 1868, and Kibbe, in turn, sold the land to J. A. Bel by warranty deed on January 16, 1901. This deed shows on its face a cash consideration and that it is an act translative of property. There is nothing in the record to show that Bel had knowledge of any prior defect in the title of Kibbe and, certainly, there was no defect patent on the face of the deed by which Kibbe conveyed the property to Bel, nor was there any defect on the face of the deed by which Kibbe acquired the property from Johnson.

The judge of the district court correctly found that there was nothing in the record "that would indicate or even suggest bad faith, legal or otherwise, on the part of J. Albert Bel when he acquired this tract of land from William G. Kibbe," and that it was immaterial as to whether Kibbe was the real owner of the land as long as Bel had just reason to believe and did believe that Kibbe was the real owner.

Bel died in 1919 and plaintiffs charge that defendants, who are claiming as his heirs, were in bad faith because of a

certain compromise agreement entered into by the Succession of Bel with Mrs. Clara Barbe in 1923. The trial judge correctly found that there was no merit in plaintiffs' charge. At the time the compromise was effected the prescription of ten years acquirendi causa had accrued and defendant's prescriptive title was complete. Moreover, the so-called adverse claim was not made by the plaintiffs, but was made by Mrs. Barbe who was opposed to the plaintiffs. Defendants denied the validity of the claim of Mrs. Barbe (no claim was made by plaintiffs at the time) to title under Rio Hondo Claim No. 251. The position taken by defendants was held to be correct by this Court in the case of Little v. Barbe where it was decided that Mrs. Barbe did not hold title under the Rio Hondo Claim. The compromise proved, if it proved anything, not that the ·defendants knew of an outstanding title, but that they knew only of an outstanding claim, the merits of which they denied. As is the case in nearly all compromises, in order to avoid the expense of litigation defendants paid Mrs. Barbe for the release of an adverse record title that operated as a cloud on their title. Incidentally it may be observed that the compromise was entered into when the Texas Company bought the timber and when an examination of the abstract revealed an adverse record title claimed by Mrs. Barbe which the Texas Company obviously decided to dispose of to avoid litigation.

■ In order to acquire the ownership of immovables by the acquisitive prescription of ten years, four conditions must concur—good faith, a just title, uninterrupted possession as owner, and an object which may be acquired by prescription. Civil Code, art. 3479.

■ Since we have found that the deed from Kibbe to Bel was valid in form, described the property conveyed with sufficient particularity, and that Bel acquired the property believing Kibbe was the real owner, the conditions of good faith, just title and identity of the property required by the Code article have been established by the defendants. This leaves for consideration the other requirement of the Code article, to wit, the public continuous and uninterrupted possession of the immovable as owner for the prescriptive period of ten years.

The evidence shows that J. A. Bel, as owner under his deed from Kibbe, exercised physical possession of the land for more·than ten years and that the possession thereof was continued after his death through his heirs.

On the question of possession, the judge of the ·district court correctly found the facts as follows:

"On the question of possession the record shows practically without contradiction that Carr and Simmons in the year 1907 procured the permission or consent from J. Albert Bel whom they recognized as the owner of this tract of land and then built a fence across the land making a complete enclosure, it appearing from the maps in the record that this fence by extending across a neck in a large bend in the Calcasieu River, forming a kind of peninsula

which included this particular tract of land, the river with the fence furnishing a complete enclosure. The location of this fence was identified, and in fact a part of the fence, itself, was brought into Court and filed in evidence. The record shows that this tract of land was then used by Carr and Simmons for pasturing hogs and cattle; that they with the consent of the said J. Albert Bel whom they recognized as owner maintained this fence and continued to use this tract of land continuously up until the storm of 1918. It is true that there is no evidence that Carr and Simmons ever paid any rentals to J. Albert Bel for the use of this land, but while this is true, it is clear that they were not exercising these continuous acts of possession for themselves, for they had procured the permission from J. Albert Bel to use the land and were occupying it with his consent, and since they were not possessing it for themselves and since they were recognizing J. Albert Bel as the owner, and occupying it with his consent, in the opinion of this Court they were possessing the same for the said J. Albert Bel and adverse to the plaintiffs' claims.

"Mr. A. B. Goos testified that he is familiar with this tract of land; that his father, A. E. Goos, was for several years, from about 1907 to 1910, employed by J. Albert Bel to look after his timber lands and to scale timber; that he, the witness, and his father, cut and hauled cypress timber from this particular land during these years for J. Albert Bel and loaded it on barges for the J. Albert Bel sawmill. This witness has also seen many times this fence above

mentioned maintained by Carr and Simmons. This testimony was corroborated by some two or three other witnesses. The record further shows that J. Albert Bel and his heirs have paid all taxes on this land from 1908 to 1940, or for more than thirty years.

"On the other hand there is no evidence in the record, nor is there any suggestion, so far as this Court can see, that any one of these plaintiffs, either personally or through any agent or employee, was ever on this particular tract of land or ever exercised a single act evidencing occupancy or possession thereon; nor is there any evidence in the record, so far as this Court can see, that any of these plaintiffs, either personally or through any agent or employee, ever at any time claimed or protested to J. Albert Bel or to any of his agents or employees relative to the claims or acts of J. Albert Bel as to this particular tract of land. It is true that the alleged main portion of the original Rio Hondo Claim No. 251 which lies opposite and just across the river was claimed by these plaintiffs and their claim as to this portion has been confirmed by the Courts, but since the facts and the law applicable to these facts relied upon as a basis for the claim of the main portion of this alleged tract across the river is substantially different from the facts in connection with the particular tract involved in this suit, in the opinion of this Court the facts in connection with the main tract across the river would not govern in this case."

In January 1923, Mrs. J. A. Bel and the heirs of J. A. Bel sold the timber remain-

ing on the tract of land to J. C. Nickerson who, in turn, in May, 1923, sold the timber to the Texas Company.

Beginning in 1923, W. J. Ellender patrolled the lands, together with other lands, for the Texas Company, which company in 1925 cut a quantity of timber from the land.

In 1933 the widow and heirs of J. A. Bel executed a mineral lease in favor of the Union Sulphur Company. This lease included the land involved in this suit.

All the foregoing instruments were timely recorded in the clerk's office of the Parish of Calcasieu.

We find no substance in plaintiffs' argument that Carr and Simmons possessed the property for themselves and not for Bel. That is something they could not and did not do. They went on Bel's property and continued to occupy the property only by his consent.

"One may possess a thing not only by one's self, but also by other persons." Civil Code, art. 3433.

"The circumstance of having been in possession by the permission or through the indulgence of another person, gives neither legal possession nor the right of prescribing."

"Thus, those who possess precariously, that is, by having prayed the master to let them have the possession, do not deprive him thereof, but, possessing by his consent, they possess for him." Civil Code, art. 3490.

It is clear that Carr and Simmons must have had possession of the land for some

one. Their possession could not be for themselves, because having obtained the consent of Bel, they could not, under the provisions of the Civil Code, possess adversely to him. Since they must have possessed for some one, their possession could be for no other person than Bel from whom they obtained the right to possess and by whose sufferance they remained on the land. Their possession being for Bel, it was clearly adverse to the claims asserted by plaintiffs in this suit.

Since the conditions necessary to acquire the ownership of immovables by the acquisitive prescription of ten years have been fully established by the defendants, they were properly recognized by the judge of the district court as the true and lawful owners of the tract of land in dispute.

For the reasons assigned, the judgment appealed from is affirmed.